UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CR NO.: 04-10299-PBS |
| | : | |
| VS. | : | May 24, 2006 |
| | : | |
| ANDRES MARTINEZ | : | |

**DEFENDANT'S SECOND SENTENCING MEMORANDUM**

The defendant Andres Martinez disputes the Probation Departments assessment that he warrants a 4 point enhancement under USSG 3B1.1 for a leadership role in activity involving five or more participants.

The guidelines were adopted to enhance the ability of the criminal justice system to reduce crime through an effective fair sentencing system; and to provide uniformity in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct by similar offenders. U.S.S.G. Manuel, Introduction and General Application Principles, 1A1.1; Mistretta v. United States, 488 US 361 (1989); United States v. Snyder, 136 F.3d 65 (1st Cir. 1998); United States v. Labonte, 70 F.3d 1396 (1st Cir. 1995).

The guidelines, however, were not intended to discontinue the courts historical practice of considering the relevant circumstances of the defendant's real conduct. United States v. Cruz, 120 F.3d 1 (1st Cir. 1997) (en banc); United Sates v. Lombard, 72 F.3d 170 (1st Cir. 1995); United States v. Jackson, 3 F.3d 506 (1st Cir. 1993); see generally, Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1 (1988).

As now Justice Breyer noted, the Guidelines evince a compromise between a pure "charge offense" system in which sentences are determined based solely upon conduct of which a defendant is convicted, and a "real offense" system in which sentences are fashioned in view of all relevant mitigating and aggravating factors surrounding the defendants conduct. id; United States v. Lombard, supra.

In the process of achieving that objective the primary goals of "certainty, uniformity and fairness" maintain their position as essential ingredients of the sentencing process. United States v. Unger, 915 F.2d 759 (1st Cir. 1990); cert denied, 498 US 1104 (1991); United States v. Mocciola, 891 F.2d 13 (1st 1989). In this case the addition of four points for a leadership role offends the intent of the guidelines and results in sentence disparity.

The determination of a defendants role in an offense is heavily dependent on the facts of the particular case, United States v. McLean, 409 F.3d 492 (1st Cir. 2005); United States v. May, 343 F.3d 1 (1st Cir. 2003); United States v. Funtes-Moreno, 895 F.2d 24 (1st Cir. 1990); United States v. Wright, 873 F.2d 437 (1st Cir. 1989), and requires the District Court to draw inferences from a variety of data including information in the pre-sentence report and the defendants statements and demeanor at the sentencing hearing. United States v. Herrera, 878 F.2d 997 (7th Cir. 1989); United States v. Mejica-Orosco, 867 F.2d 216 (5th Cir. 1990). It is a mixed fact-law question. United States v. Joyce, 70 F.3d 679 (1st Cir. 1995); United States v. Diaz-Villafane, 874 F.2d 43 (1st Cir. 1989).

The guidelines themselves do not specifically define "organizer, leader, manager or supervisor," but the commentary to the guidelines provides some basis for discerning when an upward adjustment for an aggravated role under 3B1.1 is appropriate. United

2

States v. Ventura, 353 F.3d 84 (1st Cir. 2003); United States v. Tejeda-Beltran, 50 F3d 105 (1st Cir. 1995); United States v. Fuller, 897 F.2d 1217 (1st Cir. 1990).

First, the comments clearly indicate that section 3B1.1 is intended to apply only to criminal activity engaged in by more than one participant. United States v. Soto Beniguez, 356 F.3d 1 (1st Cir. 2003); United States v. Morrero-Ortiz, 160 F.3d 768 (1st Cir. 1998). United States v. Abitoye, 923 F.2d 221 (1st Cir. 1991). Second, the evidence must show that the defendant exercised control over or was otherwise responsible for organizing the activities of other individuals in committing the crime. United States v. Laboy, 351 F.3d 578 (1st Cir. 2003); United States v. Lopez-Lopez, 295 F.3d 165 (1st Cir. 2002); United States v. Veilleux, 949 F.2d 522 (1st Cir. 1991). And third, the four point enhancement is proper where the activity involved five or more participants. United States v. Martinez-Medina, 279 F.3d 105 (1st Cir. 2002); United States v. Li, 206 F.3d 78 (1st Cir. 2000).

The enhancement requires some degree of control or organizational authority over others. United States v. Cali, 87 F.3d 571 (1st Cir. 1996); United States v. Fuller, 897 F.2d 1217 (1st Cir. 1990). Managerial status generally attaches if there is evidence that the defendant, in committing the crime, exercised control over or was otherwise responsible for overseeing the activities of others. United States v. Webster, 54 F.3d 1 (1st Cir. 1995); United States v. Munoz, 36 F.3d 1229 (1st Cir. 1994); United States v. Savoie, 985 F.2d 612 (1st Cir. 1993).

The Court may draw on all relevant conduct when determining whether the defendant was an organizer or leader for the purposes of the guidelines. United States v. Laboy, supra; United States v. Ruiz-Batista, 956 F.2d 351 (1st Cir. 1992). It may also

consider the exercise of decision making authority, the nature of his participation in the commission of the offense, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the alleged activity and the degree of control and authority exercised over others. U.S.S.G. 3B1.1 cmt. (N4); United States v. Soto Beniquez, 356 F.3d 1 (1st Cir. 2003); United States v. May, supra; United States v. Conley, 156 F.3d 78 (1st Cir. 1998); United States v. Graciani, 61 F3d 70 (1st Cir. 1995).

In United States v. McLean, 409 F.3d 492 (1st Cir. 2005) the Court upheld the assignment of a three level enhancement to Navarro because he was the local supervisor of all the conspirators in the state of Maine. The evidence showed that Navarro managed the assets of the conspiracy, controlled the local participants and re-supplied the local participants. Id 496.

In United States v. May, 343 F.3d 1 (1st Cir. 2003) the defendant conceded that he was a key player and a manager but argued that he had a middleman role that prohibited a four level enhancement. The trial court found that he was deserving of four points, and the Court of Appeals approved because he and Barbour instigated the conspiracy; and because he recruited participants, received payments, divided the proceeds and took over the organization when Barbour was arrested.

In United States v. Laboy, 351 F.3d 578 (1st Cir. 2003) the court gave the defendant a four point upward adjustment because Laboy attended gang meetings and was identified as a leader. Lower level gang members were directed to take their problems to Laboy, and he had several gang members selling drugs on his behalf.

In <u>United States v. Picanso</u>, 333 F.3d 21 (1st Cir. 2003) the defendant was given a four point leadership enhancement as an organizer because he coordinated others and was responsible as a wholesaler of bulk amounts of cocaine. The Circuit Court approved this assessment.

In each of those cases the court found core facts to support the enhancement. It was not a matter of intuition or speculation. Similarly, a court that assigns a four point increase must ground its decision on facts that demonstrate that the defendant was an organizer, leader, manager or supervisor in any criminal activity, which involved five or more participants. <u>United States v. Soto Beniguez</u>, 356 F.3d 1 (1st Cir. 2003); <u>United States v. Kneeland</u>, 148 F.3d 6 (1st Cir. 1998); <u>United States v. Goldberg</u>, 105 F.3d 770 (1st Cir. 1997).

The cases in which leadership points have been approved all support the notion that a managerial or leadership role envisions something more than a neutral relationship between parties who are each performing tasks to make the artifice work. There needs to be supervision of others, <u>United States v. Nelson Rodriguez</u>, 319 F.3d 12 (1st Cir. 2002); <u>United States v. Mitchell</u>, 85 F.3d 800 (1st Cir. 1996); <u>United States v. Belardo-Quinones</u>, 71 F.3d 941 (1st Cir. 1995); or extensive involvement in the planning or execution stages of the crime. <u>United States v. Fosker</u>, 124 F.3d 52 (1st Cir. 1997); <u>United States v. Frankhauser</u>, 80 F.3d 641 (1st Cir. 1996); <u>United States v. Camuti</u>, 78 F.3d 738 (1st Cir. 1996); <u>United States v. Twitty</u>, 72 F.3d 228 (1st. Cir. 1995).

It is also proper to impose these enhancements where the defendant recruits others into the enterprise. <u>United States v. Conley</u>, 156 F.3d 78 (1st Cir. 1998); <u>United States v. Webster</u>, 54 F.3d 1 (1st Cir. 1995). All of these findings, however, must be rooted in the

evidence and may not be based on a judges' hunch. United States v. Ortiz, 966 F.2d 707 (1st Cir. 1992). It is not sufficient if the parties are equals, United States v. Di Santo, 86 F.3d 1238 (1st Cir. 1996) or if the defendant worked with the leader and even performed duties which assessed the organizations risk of loss. United States v. Cali, 87 F.3d 571 (1st Cir. 1996).

The Probation Department recommended the four point increase in the case against Martinez because:

> The defendant organized the delivery of 50 Kilograms of cocaine on May 1, 2004 and he was the leader of an organization that included at least 5 participants, Valentin Martinez, Daniel Aguilar, Roberto Solorio, Manuel Germosen, Maria Escobar and himself.

It is not clear to counsel whether the Probation Department is recommending the four point enhancement because the defendant organized the May 1, 2004 delivery of 50 kilograms and employed 5 or more participants in that activity; or that he organized the May 1st delivery and that he, on other occasions, was the leader of 5 or more participants.

Under either scenario the governments effort failed. In the first, there is no evidence that he organized the delivery on May 1st, and there were only 4 participants, Martinez, Escobar, Aguilar and Solario.

None of the other evidence supports the argument that Andres Martinez was the leader of an organization that was involved in criminal activity. This is especially compelling when one integrates all of the other conversations which the defendant had with other people. Some of them relate to civil actions, some to the used car business, some relate to family and friends, some relate to loans which were made, some relate to

6

the payments by the defendant of the medical expenses of a friend, and others, were conversations about nothing.

The defendant will use the offense conduct referred to on pages 9 through 16 of the pre-sentence report, which comes from the governments, "relevant conduct" statement.

The evidence reveals that in early 2003 the DEA began an investigation of Jose Rosales. In March of that year eight controlled purchases were made from the Rosales organization. (par 37)

On July 31, 2003 the DEA began intercepting the phone calls being made by members of the Rosales cartel. The calls revealed that Valentin Martinez was the leader. (par. 39)

In paragraph 41, the government states that Valentin Martinez returned to Mexico where he had some problem with unidentified sources of supply. The government then states that the defendant Andres Martinez took over. That new status assigned to Andres Martinez comes from the governments interpretation of an October 30, 2003, conversation between Valentin Martinez and Manuel Germosen. The government says that this conversation confirms its position that Andres Martinez became head of the operation. The conversation is innocuous and establishes no such thing. In fact, it is not clear to the defendant how the government could ascribe such an interpretation to those words.

The first interception of Andres Martinez occurs in November 2003. The government relies heavily on the November 11, 2003 interception. During this phone call the defendant discussed money that was owed to the boss of the Player and how the

7

Player wanted his money.  The defendant also concedes that he said that Valentin Martinez had made things forty times worse.  He acknowledges that a Mercedes Benz was going to have to go to the Player from the last game that was played.  None of this, however, establishes that the decisions were made by the defendant.

The comment that "the situation was good and showing more promise" is not a statement that establishes what the government urges that it establishes.  The one thing that is obvious from that conversation and from every other one that was intercepted is that nowhere is anything said, by which a reasonable person could conclude that Andres Martinez was a leader.

He said nothing that established that he exercised control over others; he said nothing that established that he had decision making authority; and he said nothing that established that he made a claim to a larger share of the fruits of the crime.  His role on this occasion is no more than one reporting facts.

It is not, for example, like the evidence collected against Valentin Martinez and Jose Rosales.  On June 2, 2004 special agent Jean Drouin told the grand jury that Valentin Martinez was the source of the cocaine supply, (pg 28-34) and that he was the leader. (pg 34).  On June 30 2004, Drouin explained that Valentin Martinez and Jose Rosales set the price of a kilogram of cocaine. (pg 40).  Drouin, on June 30, 2004 also told the grand jury that Rosales was picking up money which was owed to Valentin Martinez. (pg 12).  Drouin testified that Rosales was in charge of collecting "what's around from customers," on June 30, 2004. (pg 75-76).  When Valentin went to Mexico, he put Rosales in charge. (06-30-04 pgs 77-79).

On January 25, 2003 a call was intercepted between Valentin and Germosen, in which it is said that Valentin was complaining about the defendant trying to implement a system that was "too old and wrong".

Andres Martinez was in Mexico until February 13, 2004. He clearly was not in Massachusetts in January of 2003; and if the government is going to argue that he was making changes over the telephone it should be required to produce its evidence, not its suspicion.

Even the March 5, 2004 comment attributed to the defendant, "we are going to get going to the big league season" is meaningless if it is not connected directly to a project over which the defendant exercised control. See <u>United States v. Frankhauser</u>, supra

The conversations with Luz Luciano and William Holmes are susceptible of varying interpretations. But neither conversation, nor either of the witnesses, establish that the defendant held a leadership role.

It might be appropriate to mention here, that the interpretations which Special Agent Drouin has assigned to the code phrases depend largely on his experience and the side he is on. There is simply no dictionary by which anyone can translate coded words. We need to rely, not only on the witnesses experience but we need also to consider his bias. As an example of what I speak, agent Drouin, at pages 37 to 40 of his 06/02/2004 grand jury appearance, explained a phone conversation between Valentin Martinez and Jose Rosales. Martinez asked Rosales to bring "four medium coffees." Drouin candidly admitted that he thought this was a code for cocaine. But after initiating a surveillance of Rosales he realized that Rosales drove to Honey Dew Donuts where he picked up coffee. Had the surveillance not been conducted Drouin would have sworn that the "four

medium coffees" was some measure of cocaine. The point is that we should not accept the agents interpretation blindly in the absence of corroboration.

The government concedes that Andres Martinez operated a used car business in Salem. Thus, his conversations need to be considered with that background. Why, for example, should any sinister connotation be given to the November 11th conversation about the defendant being given a boat on credit, or about becoming a fisherman. One would not reward an employee with a boat that he had to pay for, and returning to the life of a fisherman could mean many things. In fact in an April 14, 2004 conversation with Abelardo, the defendant invited Abelardo to visit him in the summer to go lobster fishing on his boat.

It's hardly an explanation to say "this guy, was to me, the king of codes," (GJ 07/21/2004 pg 97), if you cannot accurately decipher the code by establishing a practice or a pattern in what has been said. Otherwise it is just a guess.

There is a reference to a band, and Drouin said that this is a code indicating that they were going to start getting shipments. (pg 98 GJ 07/21/2004). Does it mean nothing that the word "band" was used on other occasions and when investigated revealed that a real band had been rented in August. (pg. 99 GJ 07/21/04).

In the statement of relevant conduct sent to US Probation, the government said that "it became apparent that Martinez was coordinating a large shipment of cocaine" after April 28th. Yet the government does not cite a single corroborated conversation that supports that conclusion.

They interpreted expressions like "send me somebody or bring me a black car" to mean that the words are coded expressions portraying a leadership role. Or that "I need a

little more time" to mean more than what the words ordinarily establish. I venture to say that someone of Special Agent Drouin's imagination could turn the Gospels of St. John into a De Vinci Code drama.

All this said, the defendant acknowledges that he was arrested on May 1, 2004 at 6 Endicott Street where Agent Drouin seized 50 kilograms of cocaine. Nothing seen or heard prior to that arrest provides evidence that Andres Martinez played a leadership role in that event. And that is what this phase of the case is about-------- the absence of credible evidence to establish that he exercised a leadership role in that transaction.

The defendant respectfully submits that such evidence is totally and absolutely non existent.

/s/ John F. Cicilline, Esquire #0433
Attorney for (Andres Martinez)
Cicilline Law Office
381 Atwells Avenue
Providence, RI 02909
Office 401 273.5600
Fax 401 454.5600
jfcicilline387@aol.com

## CERTIFICATION

I, the undersigned, hereby certify that I cause to be deliver a true copy of the within to **Denise Rivera**, U.S. Probation Officer, US Probation Office, John Joseph Moakley, United States Courthouse, 1 Courthouse Way, Suite 9200, Boston Ma, 02210 and to **Neil Gallagher, AUSA**, U.S. Attorneys Office, John Joseph Moakley, United States Courthouse, 1 Courthouse Way, Boston Ma, 02210 on this the **25th** day of May, 2006.

RAQUEL GIL