```
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )
                            )    CRIMINAL ACTION
     v.                     )
                            )    NO. 04-10299-PBS
ANDRES MARTINEZ             )
```

UNITED STATES' SENTENCING MEMORANDUM

The United States respectfully submits this memorandum of law and fact regarding the sentencing of ANDRES MARTINEZ scheduled for June 2, 2006. The government submits that defendant should be sentenced to 292 months based on a base level of 36 and a 4-level enhancement for being a leader and organizer. The government further submits that defendant should not receive any reduction for acceptance of responsibility. In support, the government submits as follows:

I.   SUMMARY OF RELEVANT FACTS

Beginning in early 2003, the DEA along with members of the Massachusetts State Police and Lynn Police Department, began an investigation into the cocaine trafficking activities of Jose Rosales, a.k.a. "Tony," ("Rosales") in Peabody, MA. On July 31, 2003, the DEA began intercepting wire communications over Rosales's cell phones pursuant to a court authorized Title III wiretap. Starting in August 2003, DEA began intercepting cellular telephone calls of not only Rosales, but also Valentin Martinez, ("Valentin") Manuel Germosen, a.k.a "Kelvin Madera," a.k.a. "Manolo," ("Germosen") and Rogelio Garcia ("Garcia"). These wire interceptions revealed evidence of an ongoing cocaine

1

distribution organization. Valentin and Germosen employed a number of runners, including Rosales, Garcia, and Christian Germosen to deliver cocaine to and collect drug proceeds from a number of individuals in the Lynn and Peabody area.

In the late summer/early fall of 2003, Valentin returned to Mexico in order to take care of his sick mother. Intercepted calls revealed that Valentin left Rosales in charge of the cocaine distribution network. While in Mexico, Valentin directed Rosales to take possession of a "notebook" (Valentin's drug ledger) in order to account for the amount of money owed to Valentin for prior drug sales.

These wire interceptions further revealed that while in Mexico, Valentin had some problems with unidentified sources of supply of cocaine in Mexico who were referred to as "the player" and the "nephews." Because of these problems, Valentin's uncle, defendant ANDRES MARTINEZ, took over the cocaine business to resolve the debts.

Defendant ANDRES MARTINEZ was first intercepted on the wiretaps in November 2003. During intercepted calls, ANDRES was referred to as "Sacaida" and as Valentin uncle. In particular, during an intercepted call on November 11, 2003, at around 8:20 p.m. (Call No. 729), Juan Martinez, a.k.a. Chon ("Juan")(a fugitive and ANDRES' son) called ANDRES in Mexico at telephone number 52-372-424-8116. During the call, ANDRES asked to talk to "*M-30*" after which Germosen (whom ANDRES referred to as "Manolo") got on the phone. ANDRES then told Germosen about the problems

in Mexico about the money that was owed to the "boss of the player." ANDRES said that "things are not very well here . . . But it's safe to say that the situation is manageable . . . It's manageable because I talked it out. The only one that was a little bit aggressive . . . was the boss of the player." ANDRES then said that V (Valentin) did not take care of it and instead made the problem "forty times worse." ANDRES said that things looked bad for him (Valentin) because the "numbers were wrong and don't match up." Later in the call, ANDRES told Germosen that a Mercedes Benz was going to have to go to the player "from the last game that was played, he wants, wants his payment because he hasn't received his check." Then toward the end of the call, ANDRES told Germosen that things were going to go back to old times, that they going to go back to becoming fisherman because the cars were not selling. ANDRES said that "V" (Valentin) was going to be out for the season because the referee gave him a red card and said no more. Finally, ANDRES stated that "the situation was good . . . It's showing more promise than before . . . . 'Cause they are going to give me a boat on credit with a 350 horsepower engine" (referring to 350 kilograms of cocaine). ANDRES then instructed Germosen to not tell V because V was going find out about it from ANDRES.

    Days later, during an intercepted call on November 14, 2003, at around 10:53 a.m., Valentin told Germosen that ". . . it looks like they came to an agreement . . . apparently the player was still owed a little something . . . So we need to figure out how

we can cover that." Germosen and Valentin then talked about the amount of money that was owed to "the player."

During an intercepted call on January 25, 2003 between Valentin and Germosen, Valentin expressed frustration with the way ANDRES was usurping of control of the organization. Valentin complained that "Sacaida" (ANDRES) wanted to "implement a system that's too old and its wrong." Valentin also told Germosen that even though "Sacaida" was talking about coming back to Massachusetts in December (2003), his "best guess" was that they would be back by the middle of January (2004).

In January and February 2004, intercepted calls revealed that ANDRES was arranging to return to Massachusetts from Mexico. During an intercepted call on January 29, 2004, ANDRES told Germosen that he was "coming up there...going over there tomorrow...to begin the climb" (across the Mexican/United States' border). ANDRES told Germosen that the "coyote already brought them over (the Mexico/United States border) and he already has them (the cocaine) in Chicago....it's a done deal." During an intercepted call on February 4, 2004, ANDRES told Germosen that he was "close to the fence" (the Mexican/United States' border). ANDRES instructed Germosen to take the necessary steps to "form a team...and have everything ready...and tell them to be on the lookout." Thereafter, intercepted calls on February 8 and 9, 2003 indicated that ANDRES had arrived in Arizona and then traveled to southern California. During these calls, ANDRES instructed Germosen to wire him money both in Arizona and

California.  During these calls, ANDRES also indicated that he would be meeting with a source of supply of cocaine in California (who was later identified as co-defendant MARTIN CERNA-GARCIA and was the subject of a separate DEA wiretap investigation in California).

On February 8, 2004, DEA agents in California intercepted calls over a telephone used by Martin Cerna-Garcia pursuant to a Title III wiretap in Los Angles, California.  The calls related to ANDRES meeting with Cerna at a motel in Montebello, California.  In the calls that preceded this meeting, ANDRES told Cerna that he was looking at "white stuff on top of the mountains" and "they all looked white."  Later that night after ANDRES asked Cerna to meet with him at his motel in Montebello, surveillance observed and identified ANDRES (after comparing him with a photograph of ANDRES Martinez provided by Massachusetts DEA agents) coming and going from one of the motel rooms, then leaving the motel and driving to a restaurant with other individuals.

On February 13, 2004, intercepted calls indicated that ANDRES and Sagrario Godinez (his spouse) were flying to Boston and would arrive at 9:00 p.m. that night.  That night, law enforcement agents observed ANDRES and Godinez arrive on flight from California at Logan International Airport.

On February 20, 2004, DEA began intercepting one of ANDRES's cellular telephones that he had acquired in California.  On April 28, 2004, DEA began intercepting a second cellular telephone used

by ANDRES.  Based primarily on these interceptions of ANDRES's cellular phones, it became apparent that ANDRES was coordinating a large shipment of cocaine.

Valentin returned to Lynn, MA from Mexico around March 1, 2004.  After his arrival, during intercepted calls on March 1, 2004, ANDRES instructed Valentin to do two things for him: First, for Valentin to "send me somebody" (a worker). Second, and "for them to bring me a vehicle...a black car."  ANDRES stated further that he need the car "to go over there and run an errand...they told me that you had that vehicle..over there ...in good condition...and that nobody is using it...so I need it right away." ANDRES said to have Rosales "get in touch with the other guy (Germosen) and turn it (the black jeep) over to him." Valentin said he would take care of it.  (As further described below, this black jeep was used the next day to attempt to pick up cocaine in New York).

The next day, on March 2, 2004, ANDRES instructed Germosen and a cousin of the "nephew" (referred to as the Chubby guy) to drive to New York City in the black Jeep Cherokee to pick up a shipment of cocaine.  By mid-afternoon on March 2, 2004, however, ANDRES instructed Germosen to return to Massachusetts because Germosen felt uncomfortable about the delivery location. On March 2, 2004, at approximately 10:28 a.m., Germosen called ANDRES to tell him that "there is a...there is a small you know what." Germosen told ANDRES that "they are there where we went, but out in the open and they don't have the means to do it."  A short

time after that, at approximately 11:30 a.m., surveillance agents in New York City observed the black Jeep Cherokee (the same one that Valentin had acquired for ANDRES) parked in front of 1025 Westchester Ave, Bronx, NY.  At approximately 11:58 a.m., Germosen called ANDRES and told him that "things are kind of tough."  ANDRES then told Germosen that he (Germosen) needed to make a decision and remarked "tell me if you need someone to drive it....let me know...but you make the decision."
At approximately 12:38 p.m., Germosen made another call to ANDRES and said, "listen, it couldn't be done."  (Meaning that no suitable location could be found to carry out the transfer of drugs to organization vehicles, including, I believe, the black Jeep Cherokee.) ANDRES replied, "well, get going then."

Beginning in late February 2004, ANDRES arranged for several individuals, including Daniel Aguilar, a.k.a. "Lik," and Roberto Solorio to travel to Massachusetts to assist ANDRES in preparing for an upcoming shipment of cocaine to Massachusetts.

Between February 21, 2004 and March 23, 2004, ANDRES arranged for Aguilar to travel from Mexico to Massachusetts. During an intercepted call on March 1, 2004, ANDRES told Aguilar that "this was getting very close."  Aguilar told ANDRES that "So long as you give me the green light, I'll be available."  On March 5, 2004, ANDRES told Aguilar that "We are going to get going to the big league season."  On March 8, 2004, ANDRES told Aguilar to relax because there would time to work soon. Thereafter, on March 24, 2004, Aguilar arrived in Boston on a

flight from Mexico. On the same day, Roberto Solorio arrived in Boston in on a flight from San Francisco. Both Auguilar and Solorio began residing with ANDRES at his residence at 172 Lake Street in Peabody, MA.

While waiting for this impending shipment of cocaine, there were multiple calls between ANDRES and William Holmes, one of ANDRES's drug customers. During these conversations, Holmes asked ANDRES exactly "when" ANDRES expected a multi-kilogram shipment of cocaine so that Holmes could buy some of it. For example, on February 24, 2004, ANDRES called Holmes to say, "I need a little more time (to secure the cocaine shipment)...no, no, not for today...I'll call you...let me see tonight...I'll call you tomorrow morning." Two days later on the on February 26, 2004, agents observed Holmes and ANDRES meet at a Dunkin Donuts in Lynn shortly after they arranged to meet over the phone.

On April 29, 2004, (two days before the seizure of 50 kilogram seizure on May 1, 2004, in Danvers, MA) ANDRES asked Holmes if he was "going to be around this weekend." Holmes replied, "maybe, if I have to be." Holmes said he wanted "the radio, very, very necessary," ANDRES told Holmes to call him "Sunday morning...the time no problem." Holmes answered back, "even one or two radios (one of two kilograms) maybe for me?" After ANDRES confirmed Holmes' order, Holmes again specified,

"I'll wait for you, but one or two (kilograms), and make sure number one radio (good quality)...if not number one radio, no good for me, you know what I'm saying."  (After his arrest on the Second Superseding Indictment in this case on May 25, 2005, Holmes admitted post-Miranda that he had obtained kilogram quantities of cocaine from ANDRES).

On April 30, 2004, ANDRES was intercepted speaking with "the nephew" about the final arrangements for the delivery of the cocaine to ANDRES in MA.  In one intercepted call, "the nephew" asked ANDRES for a telephone number that he (the nephew) could give to the people who would be delivering the cocaine.  ANDRES gave "the nephew" (in numeric code) telephone number 978-223-0838, a telephone number that was not the subject of a Title III wiretap.

The next day, on May 1, 2004, at around 6:40 a.m., DEA agents using video surveillance outside ANDRES's residence at 172 Lake Street, Peabody, MA observed ANDRES, Solorio and Aguilar, depart the residence in two vehicles.  Agents followed Solorio and Aguilar (driving in a yellow Cadillac sedan), and ANDRES (driving in a silver Ford truck) drive from 172 Lake Street to the Countryside Motel in Peabody a short distance away.  Agents watched as Aguilar and Solorio walked into the motel's office.

According to hotel records, at 6:56 a.m., Aguilar checked into to Room #19.  Also according to hotel records, hours before at 1:00 a.m. on May 1, 2004, Estrada checked into Room # 21 at the same motel.  Agents then observed Solorio get into the

passenger side of ANDRES's silver Ford truck and depart the area with ANDRES.

Minutes later, at 7:08 a.m., ANDRES called Aguilar from telephone number 978-223-0838 (the same number that ANDRES provided to "the nephew" in Mexico). At the time, Aguilar was using ANDRES's cell phone, (323) 834-4640 (target telephone no. 21). In the intercepted conversation, ANDRES told Aguilar that someone (referring to ESTRADA) would be knocking at the hotel door to deliver his clothes that had been "washed."

Two minutes later at 7:10 a.m., surveillance units in place at the Country Side Motel observed an unknown Hispanic male wearing blue jeans and a black T-shirt, later identified as Ricardo Estrada, walking from the cab of one of the 18 wheeler trucks and pulling behind him, on wheels, a large black suitcase. The suitcase appeared to be heavy and Estrada was observed looking in all directions as he walked with the suitcase from the parking lot and entered Room #21.

At around 8:30 a.m., agents conducting surveillance at the Countryside Motel watched Aguilar get into the yellow Cadillac sedan and back up to the doorway of Room #21, Estrada's room. Around the same time, agents observed Estrada standing in front of Room #21 talking on a cell phone. Aguilar walked past Estrada into Room #21 and walked out with two black suitcases similar in size, shape, and color to the suitcase Estrada was observed carrying into Room #21. Aguilar put the two black suitcases into the truck of yellow Cadillac and drove off.

Following this exchange, agents followed the yellow Cadillac to 6 Endicott Street in Danvers, MA.  Upon arrival at 6 Endicott Street, Aguilar called ANDRES and told him that he had the "clothes."  At around 9:00 a.m., agents entered 6 Endicott Street and detained Aguilar, Solorio, and ANDRES in the residence.  On the living room floor, agents found the two black suitcases unzipped which contained 50.18 kilograms of cocaine.

## II.    BRIEF PROCEDURAL HISTORY

On May 1, 2004, defendant ANDRES MARTINEZ was charged in a criminal complaint with conspiracy to distribute cocaine in violation of 21 U.S.C. §846.  On October 6, 2004, MARTINEZ was charged in the First Superseding Indictment with conspiracy to distribute cocaine in violation of 21 U.S.C. §§841(a)(1) and 846. The indictment further alleged, consistent with the Supreme Court's decision in Aprendi v. New Jersey, that the conspiracy involved at least five kilograms of cocaine thereby triggering a ten year mandatory minimum and a statutory maximum of life under 21 U.S.C. §841(b)(1)(A)(ii).  On March 23, 2005, a Second Superseding Indictment was returned which again charged MARTINEZ with conspiracy (Count One) and added the substantive charge of possession with the intent to distribute cocaine in violation of 21 U.S.C. §841(a)(1)(Count Nine).  As in the First Superseding Indictment, the Second Superseding Indictment further alleged that both Counts One and Nine involved at least five kilograms of cocaine pursuant to 21 U.S.C. §841(b)(1)(A)(ii).

On November 28, 2005, the court held the first of two change

of plea hearings.  During the first hearing, defendant was unable to admit to factual basis for the plea and denied having any involvement in the May 1, 2004 seizure of cocaine.

During the second hearing on December 1, 2005, MARTINEZ first told the court through his attorney that his role in the offense was to simply hide the cocaine for Luz Luciano (Maria Escobar) who was the one ultimately responsible for the withdrawal of that cocaine. (Pg 3, ln 14-24).  Defendant furthermore stated (again through his attorney) that Aguilar was not told what would be in the suitcases (Pg 3, ln 9-10). When the court asked defendant if he participated in the conspiracy charged in the indictment, defendant disputed that Aguilar was part of the conspiracy, telling the court (through the interpreter) that "He was not part of it."  (Pg 6, ln 16-20).

### III.   SENTENCING GUIDELINES CALCULATIONS

**A.   Base Offense Level**

The base offense level for controlled substance violations are driven by the Drug Quantity Table, Section 2D1.1(c) of the Sentencing Guidelines.  The quantity (weight) of the controlled substance(s) involved in the defendant's relevant conduct typically is the primary determinant of the Chapter Two offense level.  Guidelines "base offense levels" ranging from 6 to 38, in increments of two, are set forth in the Drug Quantity Table at USSG § 2D1.1(c) according to the type and quantity of the controlled substance.  In this case, the Pre-Sentence Report (PSR) has concluded that the base offense level is 36 based the

seizure of 50.18 kilograms of cocaine seized on May 1, 2004 in which defendant has admitted he was a participant.

Significantly, defendant does not contest that the weight of the cocaine which he possessed was between 50 and 150 kilograms of cocaine and has not requested a hearing on the issue of weight. Instead, defendant argues that as a matter of constitutional law, defendant can only be held account for 5 kilograms of cocaine (level 32) and not between 50 and 150 kilograms of cocaine (level 36) because this weight was not alleged in the indictment nor submitted to a jury. (Defendant's First Memorandum at 7). As support, defendant states that the Supreme Court's decision in <u>Blakely</u> and <u>Booker</u> substantially broadened the rule announced in <u>Apprendi v. New Jersey</u> that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

Defendant's argument is incorrect. Under <u>Booker</u>, the sentencing court is permitted to determine drug quantity for the purposes of calculating the base offense level under the Sentencing Guidelines:

> Under the 5-4 constitutional ruling in *Booker*, judge-made enhancements under the guidelines that result in a sentence greater than the sentence that could be based solely on facts found by the jury do amount to Sixth Amendment violations if the guidelines are treated as mandatory; but under the companion 5-4 remedial ruling in *Booker*, this problem is washed out by treating the guidelines as advisory.

13

>United States v. Julio Perez-Ruiz, 421 F.3d 11, 15-16 (1st Cir. 2005).

Contrary to defendant's assertions, "[o]nly judge-found facts that serve mechanically to raise a defendant's sentence *above that authorized by the jury verdict or guilty plea* amount to Sixth Amendment violations." United States v. Bermudez, 407 F.3d 536, 545 (1st Cir. 2005)(emphasis in original). In this case, defendant admitted that the offense involve five kilograms of cocaine, the amount of cocaine necessary to trigger the ten year mandatory minimum sentence with a statutory maximum life. See United States v. Morrisette,(1st Cir. 2005)(the "Sixth Amendment right to jury trial is not offended where the defendant was sentenced on the basis of admitted facts."). Therefore, the court can properly determine that defendant is responsible for more than 50 kilograms of cocaine and should receive a base offense level of 36.

**B.    Role in the Offense Adjustment - Leader/Organizer**

Under Section 3B1.1(a), a defendant's offense level should be increased by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. §3B1.1(a). "Although the guidelines do not explicitly define 'organizer' or 'leader,' the Sentencing Commission has identified several factors that tend to distinguish top-echelon participants. United States v. Ventura,353 F.3d 84, 89 (1st Cir. 2003).  These

14

factors include: (1) the nature of participation in the commission of the offense; (2) the recruitment of accomplices; (3) the claimed right to a larger share of the fruits of the crime; (4) the degree of participation in planning or organizing the offense; (5) the nature and scope of the illegal activity; and (6) the degree of control and authority exercised by others. U.S.S.G. §3B1.1(a), comment (n.4).

"To properly apply § 3B1.1, 'a district court must make both a status determination-a finding that the defendant acted as a leader or organizer of the criminal activity-and a scope determination-a finding that the criminal activity met either the numerosity or the extensiveness benchmarks established by the guidelines.'" United States v. Thiongo, 344 F.3d 55, 62 (1st Cir. 2003)(quoting United States v. Tejada-Beltran, 50 F.3d 105, 110 (1st Cir.1995)). "Assessing a defendant's role in the offense generally is a fact-specific task." Id.

In this case, defendant should receive a four level enhancement for being a leader and organizer. First, defendant's status as the leader of this cocaine distribution ring is clear. The primary purpose of defendant's return to Massachusetts from Mexico was to get the organization back on its feet. During an intercepted call on November 11, 2003, defendant explained to Germosen that his nephew Valentin Martinez was being put on the sidelines and that he (ANDRES) settled things with the "player,"

the source of supply of cocaine.  See United States v. Piccolo, 282 F.3d 41, 43 (1st Cir.2002) (rejecting defendant's claim he was not a leader based, in part, on the fact that three of the coconspirators identified him as their leader).  At the sentencing hearing, Germosen will testify about this conversation.  Germosen will testify that ANDRES' reference to a "350 horsepower engine" was a veiled/coded reference to shipment of 350 kilograms of cocaine to Massachusetts that Andres was coordinating.

When he arrived in Massachusetts, defendant recruited three more participants in the conspiracy, Daniel Aguilar, Roberto Solorio, and Maria Escobar to assist him in the May 1, 2004. From the intercepted calls, it was abundantly clear that it was defendant who was calling the shots and who ultimately organized the shipment of 50 kilograms of cocaine that was seized on May 1, 2004.

Second, the offense involved five or more participants and was extensive.  The co-defendants described above which defendant directed included Valentin Martinez, Juan Martinez, Manuel Germosen, Daniel Aguilar, Roberto Solorio, and Maria Escobar. Below this tier in the organization, Valentin and Germosen had their own set of runners which included Jose Rosales and Rogelio Garcia and a large group of regular whole-sale cocaine customers in Lynn and Peabody.

**C.   Acceptance of Responsibility**

Under Section 3E1.1(a), a defendant who clearly demonstrates acceptance for his offense should receive a two level reduction in their offense level.  Furthermore, under Section 3E1.1(b), if the defendant's acceptance of responsibility is sufficiently timely, and government so indicates, the court can further reduction the defendant's offense level by one additional level.  "The defendant has the burden of proving his entitlement to an acceptance-of-responsibility credit, and the sentencing court's determination to withhold the reduction will be overturned only if it is clearly erroneous." United States v. Ocasio-Rivera, 991 F.2d 1, 4 (1st Cir.1993) (citations omitted).

"Although the entry of a guilty plea prior to trial is impressive evidence of acceptance of responsibility, it does not automatically entitle a defendant to the credit." United States v. McLaughlin, 378 F.3d 35, 39 (1st Cir 2004); United States v. Bradley, 917 F.2d 601, 606 (1st Cir.1990); U.S.S.G. §3E1.1, comment (n.3)("A defendant who enters a guilty plea is not entitled to an adjustment under this section [Section 3E1.1] as a matter of right.")  Instead, the entry of a guilty plea before trial must be "combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully or not falsely denying any additional relevant conduct for he is accountable." U.S.S.G. §3E1.1, comment (n.3); see United States

v. Vega-Coreano, 229 F.3d 288, 290 (1st Cir. 2000)(not clearly erroneous for district court to deny acceptance of responsibility credit when defendant wavered in her willingness to take complete responsibility for her criminal acts).

Here, defendant has not met his burden that he has earned credit for acceptance of responsibility.  During the two plea hearings, defendant consistently wavered in admitting his own criminal conduct.  Defendant initially denied any involvement in the shipment of 50 kilograms.  In the second plea hearing, defendant attempted to shift a substantial portion of the blame to defendant Maria Escobar, a cooperating defendant.  In addition to not accepting responsibility, defendant attempted to mislead the court by affirmatively indicating that Daniel Aguilar was not involved in the drug conspiracy.  This statement was clearly false since Aguilar was convicted at trial.  See U.S.S.G. 3C1.1, comment (n.4).( an obstruction enhancement is warranted for "committing, suborning, or attempting to suborn perjury" and for "providing materially false information to a judge or magistrate.")

## Conclusion

Accordingly, the government hereby submits that defendant should be sentenced to 292 months, the low-end of the applicable guideline range for level 40.

                          Respectfully submitted,
                          MICHAEL J. SULLIVAN
                          United States Attorney

By:    /s/ Neil J. Gallagher, Jr.
                          Neil J. Gallagher, Jr.
                          Assistant U.S. Attorney
                          One Courthouse Way
                          Boston, MA

Date: June 2, 2006

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and mailed to all those not participating in ECF.

                          /s/ Neil J. Gallagher, Jr.
                          Neil J. Gallagher, Jr.